THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* BERT S. DUZAN, Plaintiff in Error.

*Opinion filed April 20, 1916.*

1. CRIMINAL LAW—*when bank draft is property.* A bank draft is property within the meaning of the statute concerning embezzlement, even though it was made payable to a named person as executrix and was indorsed by her agent in her name as executrix, where the agent was authorized to transact all business of the estate for the executrix, and where she had previously, by accepting the proceeds of another draft indorsed by the agent in the same way, recognized his authority to make the indorsement.

2. SAME—*what admissible for the purpose of showing criminal intent.* On the trial of an agent charged with embezzlement of a draft made payable to his principal as executrix of an estate, proof that the defendant also received another draft payable to his principal, which he indorsed in the same way and appropriated to his own use, is admissible for the purpose of showing criminal intent.

3. SAME—*jury may be instructed that they are not required to believe defendant's testimony.* It is proper, in a criminal case, to instruct the jury that they are not required to believe the testimony of the defendant, and that under proper circumstances, explained in the instruction, they may disregard his testimony if they see fit.

4. SAME—*jury may be instructed to ignore attorney's appeal for sympathy.* It is not error, in a criminal case, to instruct the jury that they must ignore any appeal made by the attorney of the defendant to the sympathies of the jury in view of the consequences of a verdict against him, and that it is the duty of the jury to consider the case regardless of such appeal.

5. SAME—*when affidavits of juror cannot be received in support of verdict.* Where it is alleged as error, on motion for new trial, that a certain instruction, which was a correct instruction and read to the jury, was marked "refused" and handed to the jury in that condition with other given instructions, affidavits of the jurors can not be received to show that they did not notice that any of the instructions were marked "refused" or hear any other juror say anything to that effect. (*Smith* v. *Eames,* 3 Scam. 76, *Peck* v. *Brewer,* 48 Ill. 54, and *Hughes* v. *People,* 116 id. 330, distinguished.)

6. SAME—*when error in marking correct instruction "refused" will not work reversal.* Error in marking a correct instruction "refused" when it was, in fact, read to the jury and handed to them with other given instructions will not work reversal, even though the instruction was one to which the defendant was entitled and

was not covered by any other instruction, where the guilt of the defendant is so conclusively shown by the evidence that the jury could not have done otherwise than find him guilty notwithstanding his previous good reputation, which was the subject of the instruction in question.

7. SAME—*failing to put any mark on one of defendant's instructions is not prejudicial error.* Failure of the court to put any mark on one of the instructions read to the jury and given at the request of the defendant cannot be said to be prejudicial error.

WRIT OF ERROR to the Circuit Court of Ogle county; the Hon. MAZZINI SLUSSER, Judge, presiding.

JOHN E. ERWIN, for plaintiff in error.

P. J. LUCEY, Attorney General, W. J. EMERSON, State's Attorney, and C. H. LINSCOTT, for the People.

Mr. JUSTICE COOKE delivered the opinion of the court:

Bert S. Duzan was convicted of the crime of embezzlement in the circuit court of Ogle county and was sentenced to the penitentiary under the provisions of the Indeterminate Sentence act.

Plaintiff in error is a member of the bar of Ogle county. Alice Petrie, who resided at the home of her sister, Adelaide Petrie, in the city of Oregon, in Ogle county, employed him to draft her last will and testament. Testatrix thereafter died in the month of March, 1913. By her will she made Adelaide Petrie her sole legatee and sole executrix. Mrs. Petrie employed plaintiff in error to assist her in the probate of the will, and after the will was admitted to probate and she had qualified as executrix she employed him to assist her in settling the estate. Alice Petrie had formerly lived at Fairbury, Nebraska, and she had property, at the time of her death, in that city. It is uncontradicted that Adelaide Petrie informed plaintiff in error that there was some property in the Harbine Bank of Fairbury, Nebraska, and that she desired to have it brought to the city

of Oregon. It was thereafter ascertained that there was at that time in that bank the following property of the estate of Alice Petrie: A savings deposit of $388.79 and one of $1201.04; also a note and mortgage upon which there was a balance due of $900, with accrued interest from January 26, 1913. At the request of plaintiff in error, the Harbine Bank, on May 21, 1913, mailed him a draft, payable to Adelaide Petrie, executrix, for $388.79, (the amount of the smaller savings account,) and on May 23, 1913, this draft was cashed by plaintiff in error at the Oregon City Savings Bank, he indorsing it, "Adelaide Petrie, Executrix, per Bert S. Duzan, her att'y." Of this sum plaintiff in error turned over to Mrs. Petrie $338.79, retaining $50, with her consent, to apply on his fee. On May 22, 1913, another draft for $1201.04, payable to the order of Mrs. Petrie as executrix, was mailed to plaintiff in error by the Harbine Bank, and on May 24, 1913, this draft was paid by the Oregon State Savings Bank to the plaintiff in error, he indorsing it the same as he had the first draft. On May 28, 1913, the Harbine Bank mailed plaintiff in error a draft for $900, payable to the order of Mrs. Petrie as executrix, and on May 29, 1913, this draft was cashed by plaintiff in error at the Oregon State Savings Bank, he indorsing it the same as he did the first draft. No part of the amounts of the last two mentioned drafts has ever been paid by plaintiff in error to Mrs. Petrie. Plaintiff in error was indicted for the embezzlement of the $900 draft.

The facts above detailed are uncontradicted. Plaintiff in error testified on the trial that after he was employed by Mrs. Petrie she directed him to ascertain the amount of the mortgage and the money on deposit in the Harbine Bank, and that on April 9, 1913, he wrote a letter to the bank inquiring what was on deposit and also about the mortgage; that in reply to this letter the bank wrote him that Mrs. Petrie had a balance in the savings department of $388.79 and a mortgage due about February 1, 1914, amounting to

$900, which was all that could be found; that he later saw
Mrs. Petrie and advised her of the contents of this letter;
that at this interview Mrs. Petrie was accompanied by her
daughter, Florence Dexter. He testified that in that con-
versation Mrs. Petrie expressed the desire to have the bal-
ance in the savings account and the note and mortgage sent
to Oregon, and that he told her that the mortgage was no
doubt drawing a higher rate of interest in Nebraska than
she could secure here and that she had better leave it there,
but she insisted upon having the same sent to Oregon; that
he thereupon wrote the bank to send the balance of the sav-
ings account and to return the note and mortgage; that
in response to this letter the bank sent him the draft for
$388.79 but stated that the mortgagor preferred that the
mortgage be kept at home, and offered to send a draft for
$900 and close the deal; that upon receiving this letter he
sent for Mrs. Petrie and she came to his office; that he read
this letter, which was dated May 21, 1913, told her that he
had received a draft for $388.79, and thereupon paid her
the amount of that draft less $50 which it was agreed he
should 'apply upon his fees; that he told Mrs. Petrie that
he was in need of some money, and that since the bank
wanted to keep the mortgage there, if they would send on
the $900 he could use it and would pay her five per cent on
it for the full year from the date of the note and mort-
gage, which was January 26; that she said she did not
need the money,—just so she was sure she would get it
when it was time to close the estate it would be satisfactory
to her; that at that time Mrs. Petrie talked to him about a
niece who was consulting an attorney and was threatening
to bring a suit to contest the will of Alice Petrie; that in
the afternoon of May 24, 1913, he received another letter
from the Harbine Bank, which was dated May 23, stating
that in looking over their books they had discovered that
Mrs. Petrie had two savings accounts, in one of which she
had the amount which had previously been sent to plaintiff

272 — 31

in error and in the other the sum of $1201.04, for which they inclosed a draft; that upon receiving that letter he at once sent for Mrs. Petrie; that she came to his office and he read this letter to her and talked to her about using the $900 and paying her interest upon it, and told her that he could use this additional sum of $1201.04 nicely at that time and pay her interest upon it; that he had money coming in later and no doubt would have plenty of it by the time the estate would be closed up, so there would be no question about being able to pay it over at that time; that he told her of several sources from which he expected to receive money in the near future; that she gave her consent for him to use these sums and told him to keep a record of it; that as far as she cared, he could have the money if he would have it ready for her when it was time to close the estate; that he stated to her that he had cashed the first draft that was payable to her as executrix, as her attorney, and told her if it was all right with her he would cash the draft for $1201.04 in the same way and keep a record of it and use the money, and that she replied, "Very well;" that he also told her he had written that morning to the bank to send the $900 and no doubt it would come payable to her as executrix and asked for permission to indorse that draft as her attorney, and that she told him it would be all right so far as she was concerned; that on February 14, 1914, he paid Mrs. Petrie $45, being the amount of interest due on January 26 under their agreement in reference to the $900 loan; that at the time he gave her this check he told her it was for the interest on the $900 loan; that he also told her, in explaining why he did not pay the interest on the $1201.04 loan at that time, that there was a balance due him for services rendered the estate and there would be more services to be rendered, and if it was satisfactory to her he would let the interest on the $1201.04 apply on his services, which would amount to practically the same as the interest, to which she assented; that in the

book in which plaintiff in error kept account of his business transactions with different people he kept his account with Mrs. Adelaide Petrie as executrix, but that he never gave Mrs. Petrie a note or any other written memorandum of this indebtedness and never made any other record of it except that which he made in his own book account; that in March, 1914, he asked her to loan him $2000 which she had on deposit in the Ogle County Bank; that in April, 1914, her niece and nephew filed a bill to contest the will, and she came to his office in reference to it and paid him a retainer in that proceeding of $200, which was to apply on his fees in the matter of the contest of the will; that he was at the residence of Mrs. Petrie on February 13, 1915, when he told her that he did not have the money but that he expected to have it in a day or two and that she would be paid; that the daughter, Mrs. Dexter, was there, and Mrs. Petrie said that she did not want to make plaintiff in error any trouble, and he said that he did not want any trouble or embarrassment about it and that he would get the money; that she said she had seen the State's attorney, and she seemed to be vindictive.

Adelaide Petrie testified that at the time she employed the plaintiff in error she told him she did not know much about business, and he told her she did not need to,—that he would do all the business and wanted her to leave it to him; that he advised her to leave the $900 in Nebraska, and that she did not know until January, 1915, that he had collected the $900 or had received the draft for $1201.04; that she never had any such conversations with plaintiff in error as he related in reference to borrowing either the $900 or the $1201.04; that in January, 1915, she employed Lyman Dexter to find out for her the condition of the estate, and he discovered that plaintiff in error had received the draft for $900 and a draft for $1201.04 from the Harbine Bank, and that this was the first time that she had ever known that these amounts had been received by plaintiff in

error; that plaintiff in error had never told her at any time that he had collected these amounts on the drafts and she had never given her consent to collect the amount of the mortgage; that plaintiff in error had never turned over to her any part of the amount he had collected on these two drafts; that on February 13, 1915, plaintiff in error was at her home and she told him she needed the money and that if he did not get it it would cripple her, and that he said if it would cripple her what would it do to him; that from May, 1913, until January, 1915, plaintiff in error was acting as her attorney in the matter of the estate; that he was employed to do all the business connected with the estate and that she was simply to be the nominal executrix; that she did not recollect that he had ever given her a check for $45 as interest on the $900, although she admitted that the check was indorsed on the back in her handwriting; that she supposed this note was still in Nebraska, and that he came to her house in March, 1914, and asked her to loan him $2000 which she had in the bank at Oregon. This loan was not made.

Mrs. Florence Dexter testified that she was at plaintiff in error's office with her mother on one occasion; that she asked him at that time how much money there was in the bank in Nebraska, and he replied $900; that her mother stated that she had heard her sister say two years before that she had $2000 in the bank, and that plaintiff in error replied, "No, there was $900;" that her mother said that she had better have that brought here, and plaintiff in error advised her not to do so; that she was present at her mother's home on February 13, 1915, when plaintiff in error was there; that he was to have had the money for her mother that day, and he told her he did not have it but would have it by the following Monday; that her mother said to him, "Bert, I want you to get that money for me; if I don't get it it will cripple me, because I need it," and he said, "Mrs. Petrie, I surely will have your money for

you; if it will do that for you what will it do for me? surely will have the money for you; I know the penalty;" that she said, "You must get me the money on account of your wife and babies," and he said, "I will get it for you; I will have it for you."

Lyman Dexter, an attorney at law, testified that in January, 1915, Mrs. Petrie employed him in the matter of the estate of Alice Petrie; that prior to that time he had been engaged in reference to the will contest; that in the latter part of January, 1915, he had a conversation with plaintiff in error, in which he stated that he had in the neighborhood of $1200 belonging to the estate of Alice Petrie of which no one except himself had any knowledge; that he had refrained from telling anyone concerning it so that no one would know what funds there were in the estate and it would be possible to get a better settlement of the will contest; that he asked the witness to accompany him to his office, which he did, and while there plaintiff in error produced a book and enumerated the funds he had collected or had in his possession belonging to the estate, reciting one item of $1201.04, one of $900 and one of $388.79; that he stated that he had settled with Mrs. Petrie for the last item but that he had the proceeds from the $1201.04 and $900 collections in his possession, and that he said he expected to make that good and would immediately make an effort to produce the money.

It is hardly necessary to discuss the contention that the verdict of the jury and judgment of the court are contrary to the evidence. The evidence of guilt is convincing. The testimony of plaintiff in error, standing alone, is far from satisfactory as an exposition of his innocence. While an attorney may be so lacking in prudence as to borrow money in the hands of his client as executrix and give his client no evidence whatever of the indebtedness, if he indulges in that practice he must not complain if his actions and his testimony are subjected to the closest scrutiny and re-

garded with grave suspicion when there are so many circumstances which tend to utterly discredit the story he tells. In this case the contention of plaintiff in error that he borrowed this money is thoroughly discredited. He indorsed the name of his client on the draft for $388.79 without any question and cashed it. Mrs. Petrie accepted the amount of this draft and did not question his right to indorse it. Nevertheless, plaintiff in error was particular, according to his story, to secure her specific consent to indorse her name on the other two drafts. He states that he offered in May to pay a full year's interest on the $900 from the 26th of January preceding in consideration for the loan being made to him, that date being fixed because it was the date of the mortgage and the accrued interest was forfeited when the mortgage was paid before maturity. There would appear to be some reason for the making of such an agreement as to the payment of interest on that amount. The $1201.04, however, was a savings deposit, and it does not appear that any interest was forfeited upon the collection of that account. He does not state that any special arrangement was made in reference to the time of the payment of interest on this sum, yet he testified that when he paid Mrs. Petrie, in February, the $45 which was due on the $900 on January 26, 1914, he explained as a reason for not paying the interest on the $1201.04 at that time that she owed him some fees in the matter of the estate and that by the time the estate was closed up his fees would equal the amount of interest due on that loan, although it then lacked three months of being a year from the time he claims he borrowed the $1201.04 from Mrs. Petrie. Plaintiff in error admits that in March, 1914, he attempted to borrow from Mrs. Petrie $2000 which she had on deposit in the bank at Oregon. From a consideration of all the evidence it is evident that if he had secured this loan his purpose was to replace the money he had appropriated from the funds of the estate before time for final settlement. He also testified

that in May, 1914, at the time the bill to contest the will was filed, Mrs. Petrie paid him a retainer of $200. At that time he was indebted to her, according to his own testimony, over $2100. While it is true that the mere fact that the plaintiff in error may have owed this money to Mrs. Petrie would not have precluded him from collecting a retainer, still a few months previous to this time, according to his testimony, he was offering to offset his fees due from Mrs. Petrie against the amount of interest due from him on the pretended loan. The time for closing the estate had arrived, when the loans were due according to the testimony of plaintiff in error, and it seems unreasonable if this loan was made by Mrs. Petrie, as plaintiff in error testified, that she would pay him a retainer of $200 without some protest and without asking to have it applied on the amount then due her. While plaintiff in error denies that he used the language attributed to him by Mrs. Petrie and Mrs. Dexter on the occasion when he called at Mrs. Petrie's home on February 13, 1915, he admits that Mrs. Petrie did tell him that she had consulted the State's attorney, and he told her he didn't want any trouble or embarrassment and would get her the money, but he does not say that he called her attention to the fact that the State's attorney could do nothing because this was a loan. From his own recital of what occurred on that occasion he placed himself in the position of admitting his culpability.

The plaintiff in error seeks to destroy the effect of Mrs. Petrie's testimony by calling attention to the indisputable proof that he made her a payment by check of $45 at about the time the interest would become due on the $900 note and mortgage, together with her testimony that he had never paid her interest on this amount. Mrs. Petrie was a woman seventy-four years of age, who had never had any business experience and who could not be expected to understand all the details of this business as well as a person who had had more experience along this line. But

while she had no recollection of this payment being made to her, she did admit that her signature was indorsed on the back of the check. It is not remarkable that this transaction did not particularly impress Mrs. Petrie. She had employed plaintiff in error to transact all the business in the matter of the estate and no doubt accepted any payments made to her as a matter of course. The $900 mortgage was drawing interest at the rate of five per cent, and even had plaintiff in error explained to her when he paid her the $45 that it was interest on the $900, if she believed that that loan was still in Nebraska she would naturally have associated the payment as one being made on that note and mortgage.

A careful consideration of the testimony does not leave the vestige of a doubt of the guilt of plaintiff in error.

The indictment charged plaintiff in error with the embezzlement of the $900 draft. Upon the theory that this draft was payable to Adelaide Petrie, executrix, and that it had never been delivered to the payee personally nor to a person authorized by her to receive it, it is contended that it was not property within the meaning of the statute, and that there is consequently no evidence upon which to sustain the verdict and the judgment of the court. This contention cannot be sustained. It is conclusively shown that plaintiff in error was the authorized agent of Mrs. Petrie to transact all the business arising in the matter of this estate. That she recognized his authority to indorse her name by himself as her attorney to secure the payment of a draft is shown by the transaction in reference to the draft for $388.79. When that draft was received by the plaintiff in error, although it was made payable to Adelaide Petrie, executrix, he cashed the same at the bank by indorsing her name as her attorney, and Mrs. Petrie approved the transaction and accepted the amount of the draft less the fee which he retained out of the same. Plaintiff in error was authorized by Mrs. Petrie to receive any money or evidence of indebt-

edness belonging to her as executrix of this estate, and when he received the draft for $900 it became property within the meaning of the statute, just as effectively as though it had been received by Mrs. Petrie herself.

The indictment consisted of three counts. By the first count plaintiff in error was charged with the embezzlement of the $900 draft, by the second count he was charged with larceny as bailee, and by the third count with larceny. It is contended that the court erred in denying the motion of plaintiff in error to require the People to elect as to which count of the indictment they would proceed under. We are unable to find from the abstract that any such motion was made, but, in any event, the court instructed the jury that the only question submitted for their determination was whether plaintiff in error had embezzled the $900 draft.

Over the objection of plaintiff in error the court admitted evidence of the receipt of the draft for $1201.04 and its appropriation by plaintiff in error, and it is contended that this was error. It is proper to prove other acts of embezzlement similar to the one charged, for the purpose of showing criminal intent. (*Schintz* v. *People,* 178 Ill. 320; *Juretich* v. *People,* 223 id. 484; *People* v. *Hagenow,* 236 id. 514; *People* v. *Dougherty,* 266 id. 420.) The court expressly limited the admission of this testimony to that purpose and did not err in admitting it.

Complaint is made of the giving of a number of instructions on the part of the People and of the refusal to give five instructions asked on the part of plaintiff in error. The first given instruction complained of contained the definition of embezzlement as it is found in the statute, and it is claimed that this was error, because in defining what constitutes embezzlement the instruction included elements not appearing in the indictment. The part of the instruction which is apparently complained of is that which states that if any officer, agent, clerk or servant of any incorporated company, or if a clerk, agent, servant or apprentice of any

person or co-partnership or society, takes and secretes with intent to embezzle or with intent to fraudulently convert to his own use any property, he shall be deemed guilty of larceny. The error, if any, in giving this instruction was harmless, as it is not contended that plaintiff in error took and secreted any property with intent to embezzle, and there is no proof to that effect. All the proof is to the effect that he embezzled the draft immediately upon its receipt.

Given instructions numbered 5, 6 and 7 are complained of on the ground that they invade the province of the jury. They are not subject to that criticism.

It is contended that under the holding in *People* v. *Rischo,* 262 Ill. 596, instruction No. 14 was erroneous. This instruction is materially different from the tenth instruction complained of in the *Rischo case, supra.* Here the jury are not told that if they are convinced that they have an abiding conviction of the guilt of the defendant then they are satisfied beyond a reasonable doubt.

Plaintiff in error urges that under the holding in *People* v. *Barkas,* 255 Ill. 516, instruction No. 26 is erroneous. It is proper to instruct the jury that they are not required to believe the testimony of a defendant, and that under proper circumstances they may, if they see fit, disregard his testimony. This instruction differs materially from the fifth given instruction in the *Barkas case, supra,* and is not subject to the objections made to that instruction.

The twenty-seventh given instruction told the jury that they must ignore any appeal made by the attorney for the defendant to the sympathies of the jury in view of the consequences of a verdict against him, and that it was the jury's duty to consider the case regardless of such appeal. It was not error to give this instruction.

Plaintiff in error produced twelve witnesses who testified that the plaintiff in error's reputation for honesty and integrity in that community was good. The People produced six witnesses who testified that his reputation in that

respect was bad. The eighteenth instruction offered on be-
half of plaintiff in error was on the question of the good
character of plaintiff in error and correctly stated the law.
This instruction was read to the jury and was included in
and bound with the series of given instructions. Upon this
instruction the court indorsed the word "refused," and it
was so handed to the jury and taken by them to the jury
room. The action of the court in thus indorsing this in-
struction was no doubt inadvertent, as there is no conten-
tion that it was not read with the given instructions. Upon
the hearing of the motion for a new trial each of the jurors
made affidavit that he remembered that the presiding judge
read to the jury a large number of instructions in the case
and that the instructions were taken by the jury to the jury
room when they retired; that he did not notice that any
of said instructions had written on the margin the word
"refused," and that he did not hear any. member of the
jury say anything to the effect that any of said instructions
had the word "refused" written on the margin, and that
he did not know, at any time during the consideration of
the case, that any instruction had the word "refused" writ-
ten thereon. Plaintiff in error moved to strike these af-
fidavits from the files, which motion was overruled, and
thereafter the motion for a new trial was overruled. The
People contend that these affidavits were properly received
and considered, and that they cured the error of the court,
if such it was, in indorsing the word "refused" on the mar-
gin of plaintiff in error's instruction No. 18. In support
of this contention *Smith* v. *Eames,* 3 Scam. 76, *Peck* v.
*Brewer,* 48 Ill. 54, and *Hughes* v. *People,* 116 id. 330, are
cited. It is true that in those cases the general rule is an-
nounced that the affidavits of jurors cannot be received to
impeach their verdict but may be received to support it.
An examination of the cases relied on discloses that in each
instance where this rule was invoked in favor of receiving
such affidavits complaint had been made of the misconduct

of the jury after they had retired to consider of their verdict, or of the incapacity of some juror occurring after they had retired to consider of their verdict, or the like. In no instance has the rule ever been applied where the error complained of had been committed by the court either in the admission of testimony or in giving instructions to the jury. In such cases the affidavit of a juror that the error complained of did not affect the verdict cannot be received. The jurors can no more be heard to say that in arriving at their verdict they ignored certain evidence which had been admitted or did not give any consideration whatever to certain instructions given, in order to support their verdict, than they would be heard to impeach the verdict. The affidavits were improperly received and cannot be considered in determining whether or not this was prejudicial error. This was the only instruction offered on this subject. The defendant had the right to prove his general reputation for honesty and integrity, and it was a material matter to be considered in case he elected to put his reputation in issue. He produced twelve witnesses who testified to his good reputation in this respect. On the other hand, the People produced six representative citizens,—two bank presidents, one bank cashier, one book-keeper in a bank, one merchant and one abstracter,—who testified that his reputation for honesty and integrity was bad. It is true that these witnesses did not testify that his reputation had been bad much beyond the time that this transaction concerning the $900 draft occurred. The mere fact that the People were able to produce witnesses who testified to the bad reputation of plaintiff in error did not preclude him from having the jury properly instructed upon this question. We are of the opinion, however, from a consideration of the whole case, that the marking of this instruction "refused" and giving the same in that condition to the jury does not constitute prejudicial error. The guilt of plaintiff in error is so conclusively shown from this record that it is not possible to con-

ceive how the jury could have come to any other conclusion even if they believed that plaintiff in error had previously borne a good reputation for honesty and integrity. If any doubt whatever of the guilt of plaintiff in error could be grounded upon the facts disclosed an entirely different situation would be presented, but as we view the proof made, we are of the opinion that plaintiff in error was not prejudiced by this action of the court.

The court failed to place any mark whatever upon instruction No. 21 given on behalf of plaintiff in error, and this is assigned as error. We do not think that, in any event, the reading of an instruction to the jury and the handing of it to them without putting any mark upon it at all would constitute prejudicial error. No reasonable man could draw any conclusion prejudicial to a defendant from the fact that the court had given the jury an instruction without marking it "given." *Hart* v. *Wabash Southern Railway Co.* 238 Ill. 336.

Complaint is made of the action of the court in refusing to give five instructions asked on behalf of plaintiff in error. The competent parts of these instructions were all included in instructions which were given on the part of plaintiff in error, and there is no ground for complaint on account of the refusal of any of them.

It is claimed that plaintiff in error was prejudiced on the trial by the misconduct of Mrs. Florence Dexter while her mother was upon the stand. While the record discloses that counsel for plaintiff in error objected to the conduct of Mrs. Dexter, it appears that the court did not observe any misconduct on her part, and there is nothing in the record to disclose to us what that misconduct consisted of, if there was any. There is nothing presented for review on that question.

The judgment of the circuit court is affirmed.

*Judgment affirmed.*